197 So.2d 267

James W. WILSON, Jr.

v.

SOUTHSIDE SHOPPING CENTER, INC., et al.

3 Div. 211.

Supreme Court of Alabama.

Jan. 26, 1967.

Rehearing Denied April 13, 1967.

Crenshaw & Waller, Montgomery, for appellant.

Hill, Robison & Belser, Montgomery, for appellees.

HARWOOD, Justice.

This is an appeal from a judgment rendered in favor of the respondents by the Chancellor below pursuant to a bill in the nature of a bill for a declaratory judgment. The bill sought a declaration that the complainant, James W. Wilson, Jr., was a joint venturer with the respondents and was entitled to a 20 percent interest of the assets of said joint venture upon his payment of 20 percent of the net cost of the venture.

As amended, the bill alleged the necessary steps in the development of a shopping center, and the work done by the complainant at the instance of Folmer and Flinn who owned the property; that Folmer and Flinn had authorized the complainant, a duly licensed real estate broker, to develop, and later to dispose of the proposed shopping center and had authorized the complainant to participate in a "package deal" constituting the said shopping center, provided Folmer and Flinn were not obligated to pay any real estate commission.

The bill as amended further alleged that out of the net cost of $330,000 for the "package deal," the complainant had already arranged a $250,000 construction loan, a permanent loan, which would leave it necessary to raise his $80,000 as a cash down payment. Being unable to raise this $80,000, he presented the deal to the respondents; that for the complainant's part in the said joint venture and his compensation for his services in arranging the "package deal," the complainant would acquire a 20 percent interest in the shopping center to be paid for from his 20 percent share of what is commonly called the "cash throw-off" or the difference between the cash receipts and the cash disbursements from the operation of the shopping center.

The bill as amended further averred that the respondents were to advance the cash ($80,000 estimated) to consummate the transaction, which amount was to be reduced by the proceeds of a sale of a portion of the land by the corporation to the First National Bank of Montgomery.

The bill as amended further alleged that it was the contemplation of the parties from the inception that the property would be acquired in the name of a corporation and would not be acquired by the respondents individually or by the respondents and the complainant individually; that it would be unjust and inequitable to permit the respondents to take advantage of the services of the complainant as a real estate broker and of his agreement to waive his real estate broker's commission, and to deny the complainant to participate in the transaction. The complainant specifically offered to do equity, and to pay in full in cash 20 percent of the net cost of the acquisition of the shopping center.

To the bill as amended the respondents filed five special pleas invoking the statute of frauds. The respondents also filed an answer denying the existence of any joint venture agreement between themselves and complainant.

It appears that Folmer and Flinn operate through several corporations, among them being the Meadow Corporation, which in turn owned all of the stock of Southside Shopping Center, Inc. They also own Commercial Contractors, a building and construction organization.

The Meadow Corporation owned the tract of land on which the proposed shopping center was to be built. Prior to the transaction in question, Meadow Corporation had made an executory agreement to sell to the First National Bank of Montgomery a 90 foot lot within the proposed shopping .center. Folmer and Flinn were desirous of developing this tract into a shopping center and had employed Wilson, the appel-

lant, who had had considerable experience in developing shopping centers, to carry out their plans. In the course of this operation, Wilson obtained leases on proposed buildings to be erected in the shopping center from two national chain stores and from some other commercial enterprises. For his services in obtaining these leases, Wilson was to receive a real estate rental commission in the amount of 5 percent of the leases. At present this real estate commission amounts to some $2,500 per year, though Wilson now receives only half of this amount due to the fact that he was called into military service during the promotion of the shopping center and made arrangements with another real estate agency to take over the management of the leases on a 50 percent basis.

Wilson testified that at a certain stage of the development of the shopping center, James Folmer indicated an interest in selling the shopping center as a "package deal." According to Wilson, the "package" would be a mortgage commitment to be obtained by Folmer and Flinn, the leases, the ground, the buildings, the asphalt paving, lighting, signs, etc. Commercial Contractors, a Folmer and Flinn subsidiary, were to erect the buildings at a cost of $250,000, and the land was to be sold for $80,000, a total of $330,000.

Wilson then asked Folmer if he could buy the "package," and Mr. Folmer told him that he could at a net price of $330,000 to Folmer and Flinn, as they would not pay any real estate brokerage fee.

Wilson first went to Rufus King, an attorney in Montgomery, with the proposal, but after consideration King indicated his refusal. During the negotiations with King, Wilson had also mentioned the matter to the respondent, Charles H. Wampold, Jr., in a casual manner. After further conversations, Wampold indicated a more definite interest in the proposition but was told that King had the refusal. At any rate, according to the appellant, and after King

had declined the proposition, Wampold and Wilson entered into more serious discussions, and Wampold brought in respondent Donald M. Martin as a co-purchaser with himself.

Wilson testified that he, Wampold, and Martin had many meetings and discussions and according to the appellant:

"Now, the understanding was that we would buy the shopping center with Mr. Wampold and Mr. Martin putting up the necessary cash, and then I would own twenty per cent of the shopping center, and I would pay for my twenty per cent of the shopping center out of the cash throw-off, cash throw-off being that money after debt service and after expenses, what money is left over. I would pay for my twenty per cent out of the cash throw-off. And the price of my twenty per cent would be based on how much cash they put in the shopping center. If they put up $10,000 in cash, I would owe $2,000, if they put up $100,000, I would owe $20,000, and if they got back $12,000 off the top I would get back $2,400, which is twenty per cent. The only misunderstanding we ever had was whether I would pay interest on my share while I was paying it back. That was the commission I got for putting them in my deal."

Wilson testified that during the development of the shopping center and his negotiations with Wampold and Martin, he left for military service and was on military duty on the date on which the contract of sale of the shopping center was executed between the Folmer and Flinn interests and Wampold and Martin on 7 February 1962. Wilson testified that he was not present when the sales contract was actually signed but that "we worked out the sales contract" and he knew the terms of the sales contract.

The appellee, Martin, testified that he had never had any conversation with Wilson regarding Wilson's alleged interest in the shopping center development; that Wampold had asked him if he would like to buy half interest in the land of the shopping center. Wampold mentioned to him at some stage that Wilson had stated that he would like to acquire a part of the shopping center but that he did not give the matter any thought. At no time did he have any agreement to pay Wilson 20 percent interest in the shopping center.

Wampold testified that Wilson came to him and stated that Folmer and Flinn had some land at the intersection of the Southern Bypass and Court Street in Montgomery and were interested in selling this land and the proposed buildings at a cost of $80,000 for the land and $250,000 for the buildings. When Wilson presented the proposition to him it was understood that an attorney in Montgomery had the first refusal. After the negotiations were underway, Wilson informed Wampold that sometime in the future he would like if possible, to acquire an interest in the shopping center. Wilson proposed that if he, Wilson, acquired an interest he would have to pay for it out of "cash flow." Wampold informed Wilson that this would not be satisfactory and that Wilson would have to put up cash or pledge his rental commissions in payment. Wilson would not agree to this. In this connection Wilson himself testified that in his conversations with Wampold, Wampold had suggested that he pledge his rental commissions to secure any interest in the shopping center that Wilson might buy but that he would not agree to this proposition as he "had to eat out of his commissions."

Wampold further testified that no agreement was ever entered into between himself and Wilson as to Wilson purchasing an interest in the shopping center and that Wilson never told him he was going to waive a real estate commission as payment for any interest in the shopping center and throughout his dealings with Wilson, Wilson

had stated to him that he was acting as agent for Falmer and Flinn.

On cross examination, when asked whether he, Wampold, and Martin had ever discussed how the shopping center property would be acquired, that is, whether they would form a corporation, or operate as a partnership, Wilson replied: "We talked about this * * * but we never got to this stage."

On 7 February 1962, a tripartite agreement was entered into between Meadow Corporation as seller, and Donald M. Martin and Charles H. Wampold, Jr., as buyers, and Commercial Contractors, as contractor, whereby the seller agreed to sell for $80,000, and the buyers agreed to buy the real estate constituting the shopping center. The seller also agreed to cause to be assigned to the buyer certain named leases on stores to be erected on the property.

The buyer and contractor agreed upon the closing of the transaction to execute a construction contract with the contractor for the commercial buildings to be erected on the land, the conditions and specifications for the construction being detailed in the agreement. It appears that the cost of this construction was $250,000.

The seller also agreed to sell an outstanding executory agreement of sale with the First National Bank of Montgomery of a certain described lot in the plat of the shopping center, and referred to in the proceedings below as Lot 2. The seller also agreed to secure for the benefit of the buyer a permanent mortgage loan on the land and improvements in the amount of $250,000, though the buyer was not precluded from arranging permanent financing if desired. In this connection the evidence shows that Martin and Wampold made their own arrangements for financing the project.

On 23 March 1962, the Meadow Corporation by warranty deed conveyed to Wampold and Martin individually the above mentioned Lot 2, for the sum of $45,000. It is stipulated that Wampold and Martin conveyed this lot to the First National Bank, as per the agreement between the bank and the Folmer and Flinn interests.

Also on 23 March 1962, the Meadow Corporation sold to Southside Shopping Center, Inc., the remaining land in the shopping center development for $35,000. In turn, all the stock in Southside Shopping Center, Inc., was conveyed to Wampold and Martin for a nominal cost. This was apparently because the leases had been executed to the Southside Shopping Center, Inc., and rather than undertake to have the leases changed, Meadow conveyed the real estate comprising the shopping center (other than Lot 2) to Southside, and the stock in Southside was transferred to Wampold and Martin. All of the dealings between Wilson and Wampold and Martin were verbal.

In its decree the court made no finding as to whether a contract existed between the appellant and respondents, but found that if such contract did exist, it would be unenforceable in that the evidence showed that the subject matter of the alleged agreement pertained to the acquisition of lands or interests in lands and as such was violative of the statute of frauds as pleaded by the respondents.

In brief counsel for appellant argues that:

"* * * nowhere does the relief sought by the Appellant require the transfer of any title to land or any interest in land. It only seeks an order requiring the transfer of twenty percent of the capital stock of Southside Shopping Center, Inc. Such shares of stock are, by statute in Alabama, personal property. Title 10 Sec. 21(43).

"* * * Since no transfer of title" (of real estate) "from one of the parties to the other was contemplated or re-

quired, we submit the Statute of Frauds has no application."

The appellant's testimony was to the effect that he was to have 20 percent of the "package deal" for the Southside Shopping Center. The major portion of this "package" was land and buildings. The appellant further testified that he and Wampold and Martin never in their discussions reached the stage as to whether they would acquire the property as a partnership, or form a corporation, for the acquisition of the property. If the acquisition of the property was to be by Wilson, Wampold, and Martin, as a partnership, or joint venture, then clearly the transaction did involve a vesting of an interest in real estate to which the statute of frauds would be applicable.

We think it significant that the tripartite agreement of 7 February 1962, between Meadow, Commercial Builders, and Wampold and Martin, was for the sale of the shopping center property to Wampold and Martin individually. Wilson testified that though absent on military duty at the time this agreement was executed, he knew its terms generally, and "we worked out the sales contract."

Further, the evidence is uncontradicted that as to the bank lot, the deed was to Wampold and Martin individually. In this connection Wilson testified that this was done to reduce the cash equity, and "just made it that much better a deal to reduce the cash" (required) "from $80,000 down to $45,000."

It would appear that all in all the evidence would reasonably justify the conclusion, even under Wilson's testimony, that the agreement between Wampold and Martin and himself contemplated the acquisition of the shopping center property in the three individually. Certainly it was not in the contemplation of Wilson, Wampold, and Martin at the time of their dealings that the transaction would be completed by the transfer of the capital stock of Southside Shopping Center, Inc., to Wampold and Martin. Clearly this was a last minute arrangement brought about to simplify the transfer of the shopping center property because a number of the executed leases were to Southside Shopping Center, Inc.

No partnership was in existence when the agreement as alleged by Wilson was made, as it could not exist until the property was purchased. "So it was simply a verbal agreement to purchase an interest in a partnership involving title to lands, and such agreement is violative of the statute of frauds." Butts v. Cooper, 152 Ala. 375, 44 So. 616.

A joint venture is of a nature similar in most aspects to a partnership, and is governed largely by the legal principles applicable to partnerships. Saunders v. McDonough, 191 Ala. 119, 67 So. 591.

Reilly v. Woolbert, 196 Ala. 191, 72 So. 10, concerned a bill for an accounting between partners, the bill alleging that the complainant purchased an undivided one tenth interest in the coal mining business of the respondent. The bill alleged that the respondent owned certain described real estate at the time of the agreement, *and afterwards purchased for the company with its funds other described land,* and that it was agreed that these lands and complainant's contributions should be the joint property of the partners on the basis of their respective interests. The Chancellor decreed that a partnership existed between the complainant and respondent in the proportionate interest of 1 to 9, and ordered an accounting in the partnership by reference to the register.

In reversing, rendering, and remanding the decree, this court, through Somerville, J., wrote:

"Whatever may be the rule elsewhere, it must be regarded as settled in this state that a verbal agreement for the purchase of an interest in a partnership consisting wholly *or partly* of lands, in-

volves the title to lands, and is violative of the statute of. frauds." (Italics ours.)

Counsel for appellants argues that Reilly v. Woolbert, supra, is inapplicable in that the respondent already had title to the land in question, so the enforcement of the verbal contract would have required the transfer of an interest in lands from respondent to complainant, and was for this reason violative of the statute of frauds. This overlooks that part of the bill averring that "respondent owned certain described real estate, *and afterwards purchased for the company*" (partnership) "*with its funds other described lands.*" (Italics ours.)

■ It is our opinion, as it was of the Chancellor, that the doctrine of Butts v. Cooper, supra, and Reilly v. Woolbert, supra, necessitate the conclusion that the verbal contract alleged by the appellant involved an interest in lands, and was violative of the statute of frauds.

Affirmed.

LIVINGSTON, C. J., and SIMPSON and MERRILL, JJ., concur.